Xhavin Sinha (CA Bar #309340)
SINHA LAW
3901 Lick Mill Blvd., Suite 356
Santa Clara, CA 95054
Telephone: (408) 791-0432
Email:  xsinha@sinha-law.com

Attorneys for Plaintiff
PACIFIC ENVIRONMENTAL ADVOCATES

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC ENVIRONMENTAL ADVOCATES, LLC, a California limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> VALLEY RECYCLING, INC., a California corporation; JAMES SACHER, an individual; BETTY F SACHER, an individual; and DOES 1-10, inclusive, <br><br> Defendant. | Case No.: <br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

Plaintiff PACIFIC ENVIRONMENTAL ADVOCATES, LLC ("PEA") hereby brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*.

## I.    INTRODUCTION

1.     This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and remediation against Defendants VALLEY RECYCLING, INC., BETTY F. SACHER and JAMES SACHER ("Defendants") for current and ongoing violations of the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

COMPLAINT – Page 1

**Notice Letter**

2.      On or about February 15, 2024, PEA provided a Notice of Defendants' violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) to Defendants, including a copy delivered to the President/Owner/Agent for Service of James Sacher of Defendant Valley Recycling, Inc., (dba Valley Springs Recycling, Inc.) by certified mail, at 148 Main Street in Valley Springs, California ("the Facility"), as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.      On or about March 25, 2024, PEA provided a First Amended Notice of Intent to Violations and Intent to Sue of Defendants' violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) to Defendants, including a copy delivered to the President/Owner/Agent for Service of James Sacher of Defendant Valley Recycling, Inc., (dba Valley Springs Recycling, Inc.) by mail, and electronic mail to the Facility.

4.      A copy of PEA's Notice of Intent to Sue ("Notice") is attached hereto as Exhibit A and is incorporated herein by reference.

5.      More than sixty days have passed since PEA's Notice was properly and lawfully served on Defendant, the State Board, and the Regional and National EPA Administrators.  PEA is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

## II.    PARTIES

**Plaintiff**

6.      Plaintiff PACIFIC ENVIRONMENTAL ADVOCATES, LLC ("PEA") is an environmental membership group organized under the laws of the State of California.

**Defendants**

7.      PEA is informed and believes, and on such information and belief alleges, that Defendant VALLEY RECYCLING, INC., dba Valley Springs Recycling, with its principal place of business located at 148 Main Street, in Valley Springs, California, is a for-profit corporation formed in California on May 24, 2007, in good standing with the California Secretary of State. This is attached hereto as Exhibit B.

8.      PEA is informed and believes, and on such information and belief alleges, that on September 16, 2013, Defendant VALLEY RECYCLING, INC., applied for General Permit coverage listing both the Operator and Facility as "Valley Springs Recycling, Inc." according to records on file with the Central Valley Regional Water Quality control Board and the State Water Resources Control Board ("Water Board") including the Permit Registration Document (Notice of Intent to Discharge Storm Water associated with Industrial Activities) attached hereto as Exhibit B, which was certified by Defendants under penalty of law to be true and correct.

9.      PEA is informed and believes, and on such information and belief alleges that Defendant VALLEY RECYCLING, INC., is and has been continuously since identified in the Regional Water Board's records as the Industrial General Permit applicant and operator of the Facility.

10.     PEA is informed and believes, and on such information and belief alleges that Defendant JAMES SACHER is the Chief Operating Officer and Legally Responsible Person for

the Facility according to the documents on file with the Regional Water Board and the Secretary of State.  Defendant James Sacher is also listed as the property owner.

11.     PEA is informed and believes, and on such information and belief alleges that Defendant BETTY F. SACHER is listed as the property owner for the Facility with Defendant JAMES SACHER.

### III.     JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

13.     The Permit under which this case arises is a Federally required permit based upon California state substantive law.  (*Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016))

14.     By its express language, a violation of the State permit constitutes a per se violation of the Federal Clean Water Act.  (California's Industrial General Permit Order 2014-0057 DWQ, NPDES Order No. CAS000001, Section XXI.A)

15.     Venue is proper because Defendant VALLEY RECYCLING, INC. resides in and the events or omissions giving rise to PEA's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

IV.    **ARTICLE III STANDING**

16.    PEA's organizational purpose is the protection, preservation and enhancement of the rivers, creeks, streams, lakes and oceans (and their tributaries) located in California.

17.    PEA's organizational purpose and mission is accomplished through enforcement of the provisions of the Federal Clean Water Act and California's Industrial General Permit, in seeking redress against Industrial Dischargers who violate the Clean Water Act by failing to comply with all standard conditions of the Industrial General Permit.  These standard conditions include, but are not limited to, discharges of polluted stormwater in violation of Federal and California criteria, deficient Stormwater Pollution Prevention Plans and Site Maps, deficient stormwater monitoring and sampling programs/protocols and reporting, deficient best management practices, deficient or non-existing exceedance response action reports, deficient or non-existing employee stormwater training programs, deficient or non-existing annual reports and other informational deficiencies.

18.    PEA's associational members volunteer their resources to join PEA's organizational purpose and mission.

19.    PEA has associational members throughout Northern California.  Some of PEA's members reside, work and/or recreate near the Cosgrove Creek, Springs Valley Creek, and the Calaveras River, a tributary of the Sacramento-San Joaquin River Delta Waterways (the "Receiving Waters" for Defendant's storm water run-off), and use those waters and their watersheds for kayaking, canoeing, camping, cycling, recreation, sports, fishing, swimming, hiking, bird watching, photography, nature walks and scientific study.  Their use and enjoyment of these natural resources have been and continue to be adversely impaired by Defendant's failure

to comply with the procedural and substantive requirements of the California Industrial General Permit and Federal Clean Water Act.

20.     PEA has Article III standing as an association to bring this suit against Defendant, as at least one of PEA's current members is experiencing an ongoing, concrete and particularized injury fairly traceable to Defendant's violations of the Clean Water Act and Industrial General Permit, which likely can be redressed by a judicial decision granting PEA the injunctive relief requested herein.

21.     The aesthetic and recreational interests of the individual associational members of PEA with Article III standing have been adversely impacted by Defendant's failure to comply with the procedural and substantive requirements of the California Industrial General Permit and Federal Clean Water Act, as delineated herein.

22.     In addition to harming the aesthetic and recreational interests of PEA's members with standing in this matter, Defendant's procedural violations of the standard conditions of California's Industrial General Permit have caused informational injuries to PEA's standing members by depriving these members of their substantive constitutional and statutory rights to obtain information regarding Defendant's compliance with standard conditions of California's Industrial General Permit as delineated herein, which provisions have been instituted by relevant regulatory agencies for the purposes of protecting the Waters of the United States.

23.     PEA's associational members who qualify for standing in this matter are current members who have been members of PEA since at least the date that PEA provided to Defendant the 60-day Notice of Intent to Sue attached hereto as Exhibit A.

24.     Defendant's ongoing violations of the General Permit and the Clean Water Act have and will continue to cause irreparable harm to PEA and its current standing members.

25.     The relief requested herein will redress the ongoing injury in fact to PEA and its members.

26.     Neither litigation of the claims asserted, nor the relief requested in this Complaint, will require the participation in this lawsuit of any individual members of PEA.

**Specific Standing Allegations**

27.     One of Plaintiff's associational members with the Article III has the initials DB, and identifies as an adult female with the pronouns she/her/hers.

28.      DB is a current member of PEA who has been an associational member of PEA continuously since the association officially incorporated in January 2024 and even before when the group was not incorporated in 2023.

29.     DB has regularly recreated in and around the area of the Calaveras River near the Facility, as well as in and around the creeks and canals near the Facility which drain into the Calaveras River, for at least the five years preceding this lawsuit.

30.     Furthermore, DB plans to return to these and other areas near the Calaveras River and its tributaries (which are the Receiving Waters for Defendants' facility polluted storm water runoff) to recreate, take the family, and view wildlife.

31.     DB is an avid hiker and swimmer.

32.     Every year DB visits family and friends in the area. DB grew up around this area and has seen the water quality get worse and worse each year.

33.     DB has visited the shops and restaurants in the town of Valley Springs and has enjoyed recreational walks and birdwatching near the Facility, Cosgrove Creek and the Calaveras River among other tributaries in the area.

34.     DB has visited Defendants' facility and has personally observed the horrific housekeeping practices ongoing at the Facility, including metal wastes around the facility rusting and leeching metals into the ground water. This was seen during a rain event.

35.     It was also observed an enormous amount of industrial materials stored outdoors without cover, pooled storm water onsite coming with rusting residues and other chemical and plastic materials and residues. In addition there were unmitigated amounts of junk, plastic debris, trash and other debris. The fence at the facility boundary is also in bad condition.

36.     DB has viewed the images in this Complaint and has either participated in collecting those images, or has been present when the images were taken.

37.     DB is familiar with the requirements of the General Permit and the operation of industrial businesses.

38.     DB is aware that Defendants have been ignoring their permit responsibilities at least since 2014 when visited by the Water Board.

39.     DB is aware that the chemicals and industrial materials handled at Defendants facility include heavy metals, including Zinc, Lead, Iron and Aluminum, based on public records, and which she believes are entering the Calaveras River and its tributaries after they commingle with storm water runoff and leave the Facility's boundaries, are extremely toxic to both humans and aquatic life.

40.     DB believes that the pollutants associated with Defendants' facility which leave the boundaries of the Facility during every storm event are degrading the Facility's direct Receiving Waters, Cosgrove Creek and Springs Valley Creek, both of which are within close proximity to the Facility, and which connect to the Calaveras River.

41.     As such, DB is hesitant to utilize, and even have her family utilize the Calaveras River and its tributaries and is concerned about the pollution entering the Calaveras River which DB believes is emanating directly from Defendants' facility.

42.     DB is hesitant to eat any fish from the Calaveras River due to the pollution such as heavy metals and plastic "forever chemicals" that DB believes stems from Defendants' facility.

43.     The Calaveras River is home to fish species such as the chinook salmon, rainbow trout and steelhead trout.

44.     In the past, DB has engaged in water sports in the Calaveras River during visits in the summer.

45.     However, due to DB's concerns related to the pollution continuing to emanate from the boundaries of Defendants' facility and entering the Calaveras River, by way of Cosgrove Creek and Valley Springs Creek, DB has ceased all water sport activities by her and her family in the waterways and tributaries of the Calaveras River.

46.     DB learned in details of the General Permit violations occurring at the Facility prior to the date that Plaintiff issued its Notice Letter to Defendants on February 15, 2024.

47.     DB no longer feels safe consuming any fish from the Calaveras River or its tributaries, due to the contamination of the Calaveras River and its tributaries caused by the continuing pollution emanating from Defendants' facility.

48.     DB is continuously appalled and emotionally outraged by Defendants' blatant refusal to comply with the standard conditions of the General Permit, which she believes has directly degraded the Calaveras River and its tributaries near the Facility around which DB has been recreating and plans to continue to recreate.

49.     DB is concerned about Defendants' willful General Permit violations which are

occurring at the Facility on an ongoing basis and how those violations have caused and contributed to degraded water quality in the Calaveras River and its tributaries which DB utilizes on a regular basis. DB has also observed dirty, smelly water in those areas and contemplates that her and her family's health may have been damaged by Defendants' intentional violations of mandatory environmental laws.

50.     Furthermore, since learning about Defendants' horrendous environmental violations, DB continues to engage in hiking, picnicking, birdwatching or wildlife viewing along the Calaveras River and its tributaries near the Facility but has been unable to enjoy the area aesthetically.

51.     Based on the foregoing, DB has suffered and will continue to suffer emotional, aesthetic, and recreational injuries-in-fact directly associated with the CWA and General Permit violations Plaintiff alleges are being committed on an ongoing and continuous basis by Defendants.

52.     DB's injuries can be adequately redressed by the injunctive relief requested herein.

## V.     STATUTORY BACKGROUND

53.     Congress declared that the Federal Clean Water Act was designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal and state cooperation to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

54.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not

authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

55.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

56.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Water Resources Control Board ("Water Board") to issue NPDES permits, including general NPDES permits in California.

General Permit

57.     The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The State Board reissued the General Permit on April 17, 1997, and again on April 1, 2014 (the "2015 Permit" or "General Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect between 1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

58.     On November 16, 2018, the State Water Board adopted a revised General Permit (Order No. 2018-0028-DWQ, effective on July 1, 2020.

59.     In order to discharge storm water lawfully in California, all industrial facilities discharging, or having the potential to discharge, storm water associated with industrial activity

("Dischargers") which have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI"). Dischargers have been required to file NOIs since March 30, 1992.

60.    The specific industrial facilities required to apply for General Permit coverage are identified on Attachment A to the General Permit.

61.    The General Permit contains several prohibitions. Effluent Limitation V(A) of the General Permit requires Dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

62.    Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

63.    In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that Dischargers must meet.

64.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards. The objective of the SWPPP requirement is to identify and

evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit, § X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

65.     To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, § X(B).

66.     Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet §I(1).

67.     Sections X(D) – X(I) of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges.

68.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs. General Permit, § X(H)(2). Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

69.     The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  General Permit, § X(H)(4), (5).

70.     The General Permit requires Dischargers to develop and implement an adequate written Monitoring and Reporting Program.   The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

71.     As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

72.     Section XI(B) of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the facility SWPPP.

73.     A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit §XI(B)(2)

74.     Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload into SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit § XI(B)(4)

75.     Facilities are also required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  General Permit, § XI(A)

76.     The General Permit requires operators to conduct an Annual Comprehensive facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, § XV.

77.     Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, as well as additional parameters indicated in the Permit by facility type and those parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit, § XI(B)(6)(c).

78.     The US EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.

79.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks. The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

80.     The following annual NALs have been established under the General Permit for pollution parameters applicable to all Dischargers: pH – 6.0 - 9.0 standard units ("S.U."); total

suspended solids ("TSS") – 100 mg/L; oil & grease ("O&G") – 15 mg/L; iron – 1.0 mg/L, nitrite + nitrate as nitrogen --.68 mg/L, zinc --.26 mg/L, phosphorus --2.0 mg/L, aluminum – .75 mg/L, lead – .262 mg/L, copper – .0332 mg/L, nickel – 1.02 mg/L and chemical oxygen demand – 120 mg/L.

81.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit §XII(A)

82.     When a Discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  General Permit § XII(C)

83.     For Level 2 Status, a Discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.  General Permit §XII(D)

84.     The Water Board has established an online database referred to as its Stormwater Multiple Application and Tracking System (SMARTS").  SMARTS is a platform where Dischargers, regulators, and the public can enter, manage, and view storm water data associated with General Permit compliance.

85.     The General Permit requires Dischargers to upload to SMARTS all Permit Registration Documents, including SWPPPs and Site Maps, monitoring and sampling data and Annual Reports.

86.     Section XVI(A) of the General Permit requires that all Dischargers must certify and submit to SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS.

87.     Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a legally responsible party or duly authorized representative of the facility, with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

88.     Section XXI(N) of the General Permit provides that any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under the General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000, or by imprisonment for not more than two years, or by both.  *See* also Clean Water Act section 309(c)(4).

Central Valley Region Basin Plan

89.     The Regional Board has identified beneficial uses of the Central Valley Region's waters and established water quality standards for the Sacramento River and its tributaries and the Sacramento-San Joaquin Delta in "The Water Quality Control Plan (Basin Plan) for the California Regional Water Quality Control Board, Central Valley Region – *The Sacramento River Basin and*

*The San Joaquin River Basin*," generally referred to as the Basin Plan, and the "Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary."

90.    The beneficial uses of these waters include, among others, domestic and municipal supply, water contact recreation, non-contact water recreation, wildlife habitat, warm and cold freshwater habitat, and fish spawning. The non-contact water recreation use is defined as "uses of water for recreational activities involving proximity to water, but where there is generally no body contact with water, nor any likelihood of ingestion of water. These uses include, but are not limited to, picnicking, sunbathing, hiking, camping, boating. . . hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."

91.    The Basin Plan includes a narrative toxicity standard which states that all waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life.

92.    The Basin Plan provides that water shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses.

93.    The Basin Plan provides that water shall be free of discoloration that causes nuisance or adversely affects beneficial uses.

94.    The Basin Plan provides that waters shall not contain suspended materials in concentrations that cause nuisance or adversely affect beneficial uses.

95.    The Basin Plan also prohibits the discharges of oil and grease, stating that waters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses.

96.     The Basin Plan provides that at a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and 64431-B (Fluoride) of Section 64431, Table 64444-A (Organic Chemicals) of Section 64444, and Tables 64449-A (Secondary Maximum Contaminant Levels-Consumer Acceptance Limits) and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of Section 64449.

97.     Title 22 of the California Code of Regulations provides a MCL for aluminum of 1.0 mg/L, for Cadmium of .01 mg/L, and lead of .05 mg/L.

98.     The Basin Plan provides that the pH shall not be depressed below 6.5 nor raised above 8.5; that iron levels not exceed .30 mg/L; that zinc not exceed .10 mg/L; that copper not exceed .0056 mg/L, and that cadmium not exceed .00022 mg/L.

99.     The Basin Plan requires that waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses."

100.    Table III-1 of the Basin Plan provides a water quality objective ("WQO") for iron of 0.3 mg/L.

Citizen Suit Provision of the CWA

101.    Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation." 33 U.S.C. §1365(a)(1). No action may be commenced prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator of the EPA, (ii) to the State in which the alleged violation occurs, and (iii) to any

alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A).  By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

102.    In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the district court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a). Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192.00 per day for each violation occurring before November 2, 2015, and $56,460.00 per day per violation for violations occurring after November 2, 2015.  33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

103.    Violations of provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

### VI.    FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS

104.    Defendant Valley Recycling, Inc. receives recyclable waste metals, plastics and other materials.  PEA is informed and believes that the Facility falls under standard industrial classification ("SIC") code 5093 (Scrap and Waste Metal Recycling).

105.    PEA is informed and believes that Valley Recycling, Inc. stores industrial materials outdoors that can be exposed to storm water, eroded by wind, and otherwise contaminate the surrounding watershed. Figure 1 shows a photo of the site taken on May 25, 2024, depicting some materials stored outdoors and exposed to rainwater.



Figure 1. Backyard area of Valley Recycling's Facility showing junk improperly stored outdoors exposed to rainwater.

106. Plaintiff is informed and believes, and thereupon alleges that during rain events, storm water flows over the surface of the facility where industrial activities occur and areas where airborne materials associated with the industrial processes at the facility may settle onto the ground. Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the facility's storm water channels.

107. Based on PEA's investigation, including a review of the Defendant's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"), SWPPP, aerial photography, Federal, State and local regulatory agency mapping tools and PEA's information and belief, storm water leaves the boundaries of Defendant's facility and enters Cosgrove Creek, which

flows to into the Calaveras River, via Spring Valley Creek and finally into the San Joaquin River, a navigable Water of the United States.

108.    Plaintiff is informed and believes, and thereupon alleges, that the best management practices at the facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

109.    Figure 2 shows examples of plastic litter around the site.

110.    Figure 3 shows an example of metal litter around the site. Metal pieces were observed all around the site from small springs to larger pieces.



Figure 2. Example of plastic waste litter around the site.



Figure 3. Examples of metal litter around the site.

Deficient SWPPP/Failure to Follow SWPPP

111.    On information and belief, Plaintiff alleges that since at least July 1, 2015, Defendant has failed to implement an adequate SWPPP for its facility.

112.    Plaintiff is informed and believes, and thereupon alleges, that Defendant's SWPPP and Site Map do not include each of the mandatory elements required by Section X of the General Permit, as is more particularly described in the Notice Letter attached hereto as Exhibit A.

113.    Plaintiff is informed and believes, and thereupon alleges, that Defendant's SWPPP and Site Map do not include sufficient information to comply with the mandatory elements required by Section X of the General Permit, as is more particularly described in the Notice Letter attached hereto as Exhibit A.

114.    According to information available to PEA, Defendant's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.

115.    Plaintiff is informed and believes, and thereupon alleges, that Defendant's SWPPP does not set forth site-specific Best Management Practices (BMPs) for the facility that are consistent with BAT or BCT.

116.    Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the facility's SWPPP and site-specific BMPs consistent with the General Permit.

117.    In addition, Plaintiff alleges that Defendant has failed to comply with the provisions of its current SWPPP in the areas of monitoring and reporting.

118.    Information available to PEA indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events into the San Joaquin River.

119.    Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged above with respect to Defendant's deficient SWPPP are ongoing and continuing.

Monitoring and Reporting

120.    On information and belief, PEA alleges that Defendant has an inadequate monitoring program at its facility.

121.    On information and belief, PEA alleges that since February 20, 2019, Defendant has failed to collect and analyze two storm water samples from the first half of each reporting year, and two storm water samples from the second half of each reporting year, as required by General Permit §XI(B).

122.    On information and belief, PEA alleges that Defendant has failed to conduct monthly visual observations of storm water discharges at the facility since at least February 20, 2019.

123.    On information and belief, PEA alleges that Defendant has collected samples of storm water discharges at the facility that failed to comply with the General Permit's requirement that samples be preceded by a 48-hour period without a discharge, as is more particularly described in the Notice Letter attached hereto as Exhibit A.

124.    On information and belief, PEA alleges that Defendant has failed to collect storm water samples from each drainage area at all discharge locations at its facility, for each QSE where sampling is performed, pursuant to General Permit § XI(B), as is more particularly described in the Notice Letter attached hereto as Exhibit A.

125.    PEA is informed and believes that Defendant has failed to analyze the facility's storm water samples for the required parameters, in violation of Section XI(B)(6) of the General Permit, as is more particularly described in the Notice Letter attached hereto as Exhibit A.

126.    On information and belief, PEA alleges that Defendant has failed to deliver the facility storm water samples to a qualified Laboratory within 48 hours of collection, pursuant to

Attachment H, Section 2 of the General Permit, as is more particularly described in the Notice Letter attached hereto as Exhibit A.

127.    PEA is informed and believes that Defendant has failed to upload facility storm water sample analyses within 30 days of obtaining the results of the sampling event, in violation of Section XI(B)(11) of the General Permit, as is more particularly described in the Notice Letter attached hereto as Exhibit A.

128.    PEA is informed and believes that Defendant has failed to properly analyze its collected storm water sample for the parameter of pH, in violation of Section XI(C)(2)(a) of the General Permit, as is more particularly described in the Notice Letter attached as Exhibit A.

Falsification of Annual Reports

129.    PEA is informed and believes that since February 20, 2019, Defendant has submitted inaccurate and/or falsified Annual Reports to the Regional Water Quality Control Board in violation of Sections XXI(L) and XXI(N) of the General Permit, as is more particularly described in the Notice Letter attached hereto as Exhibit A.

Failure to Implement BAT/BCT and BMPs

130.    PEA is informed and believes that since at least November 6, 2018 Defendant has failed to identify and implement Best Management Practices ("BMPs") at its facility that comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, and best available technology (BAT) for toxic and non-conventional pollutants. These technology-based pollution controls are required to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.  General Permit §§ I(C), V(A).

131.    Defendant's BMP deficiencies are more particularly described in the Notice Letter attached hereto as Exhibit A.

132.    Information available to PEA indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the facility to the San Joaquin River.

Discharges of Contaminated Storm Water

133.    Defendant Valley Recycling, Inc., has not collected and analyzed any storm water run-off since it first began operations at the facility.

134.    Information available to PEA indicates that unauthorized non-storm water discharges occur at the facility due to inadequate BMP development and/or implementation necessary to prevent these discharges, as is more particularly described in the Notice Letter attached hereto as Exhibit A.

135.    Due to the nature of the operations at the facility, coupled with the documented lack of proper BMP implementation and unauthorized non-storm water discharges, Defendant Valley Recycling, Inc., is discharging storm water containing excessive levels of pollutants specific to its operation during at least every significant local rain event.

136.    Since at least July 1, 2015, Defendant has reported numerous discharges in excess of narrative and numeric water quality standards established in the Basin Plan, as is more particularly described in the Notice Letter attached hereto as Exhibit A.

137.    Since at least July 1, 2015, Defendant has reported numerous discharges in excess of the benchmark value and annual numeric action limits established by EPA and the Water Board, as is more particularly described in the Notice Letter attached hereto as Exhibit A.

138.     Since at least February 20, 2019, Defendant has reported numerous discharges in excess of the Effluent Limitation Guidelines (ELGs) contained in 40 Code of Federal Regulations Chapter I, Subchapter N, commencing with Section 405, as is more particularly described in the Notice Letter attached hereto as Exhibit A.

Failure to Comply with Required Exceedance Response Actions

139.     On July 1, 2022, Defendant was elevated to Level 1 Status for exceedances of TSS.

140.     Only July 1, 2023, Defendant was elevated to Level 1 Status for exceedances of COD and Lead.

141.     Pursuant to Section XII of the General Permit, Defendant's Level 1 ERA Report was due to be prepared and uploaded into SMARTS by January 1, 2024.

142.     To date, Defendant has failed to submit a Level 1 ERA Report.

143.     Defendant submitted a Level 1 ERA report on July 1, 2020.  However, that Report is deficient, as is more particularly described in the Notice Letter attached hereto as Exhibit A.

Failure to Comply with a Mandate of the Regional Water Board

144.     On the Regional Water Board issued a Notice of Violation to Defendant for failure to Collect and Analyze Storm Water Runoff on February 8, 2019.

145.     The Notice of Violation required that Defendant correct the following issues requiring that the Facility 1) Submit a report explaining why storm water samples have not been collected and analyzed for the first half of the current reporting period, while additionally describing what actions will be implemented to ensure that storm water sampling and analysis is conducted in accordance with the Industrial General Permit requirements in the future; and 2) Submit documentation of SWPPP training provided to the Pollution Prevention Team regarding storm water sampling and analysis by March 11, 2019.

146.    To date, Defendant Valley Springs, Inc. has failed to comply with the mandates of the Regional Water Board, as is more particularly described in the Notice Letter attached hereto as Exhibit A.

<u>Failure to Train Employees</u>

147.    The General Permit requires all Dischargers to designate a Legally Responsible Person to implement the requirements of the Permit.   The Legally Responsible Person is responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

148.    Plaintiff is informed and believes that since at least July 1, 2017, Defendant Valley Springs, Inc.  has failed to implement and train a Pollution Prevention Team at its facility.

**FIRST CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

149.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

150.    The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP.

151.    As outlined herein, Defendant has failed to develop and implement an adequate SWPPP for its facility.

152.    Each day since  November 6, 2018, that Defendant has failed to develop, implement and update an adequate SWPPP for the facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

## SECOND CAUSE OF ACTION
### Failure to Develop and Implement an
### Adequate Monitoring and Reporting Program
### (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

153.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

154.    The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

155.    As outlined herein, Defendant has failed to develop and implement an adequate monitoring and reporting program for its facility.

156.    Each day since at least November 6, 2018, that Defendant has failed to develop and implement an adequate monitoring and reporting program for its facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

## THIRD CAUSE OF ACTION
### Submission of False Annual Reports to the Regional Water Board
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

157.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

158.    Section XVI of the General Permit requires that Annual Reports submitted to SMARTS be certified under penalty of law, pursuant to Section XXI(L), which provides significant penalties for submitting false information.

159.    Specifically, Clean Water Action section 309(c)(4) and Section XXI(N) of the General Permit provide a maximum penalty to any person who knowingly makes a false material

statement, representation or certification in any record or other documents submitted or required to be maintained under the General Permit, including Annual Reports, up to and including a fine of $10,000 and imprisonment of two years, or both.

160.    As delineated herein, Defendant Valley Recycling, Inc., made false representations in the facility's Annual Report(s).

161.    Each time since November 6, 2018, that Defendant submitted false statements to the Water Board under penalty of perjury is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

**FOURTH CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

162.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

163.    The General Permit's SWPPP requirements and Effluent Limitation V(A) of the General Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

164.    As alleged herein, Defendant has failed to implement BAT and BCT at the facility for its discharges of pollutants, in violation of Effluent Limitation V(A) of the General Permit.

165.    Each day since at least November 6, 2018, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

## FIFTH CAUSE OF ACTION
### Discharges of Contaminated Storm Water
### in Violation of Permit Conditions and the Act
### (Violations of 33 U.S.C. §§ 1311, 1342)

166.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

167.     Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

168.     Plaintiff is informed and believes, and thereupon alleges, that since at least November 6, 2018, Defendant Valley Recycling, Inc., has been discharging polluted storm water from its facility, in excess of applicable water quality standards in violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit.

169.     During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at both facilities, becoming contaminated with pollutants associated with the industrial activity occurring at Defendant's facility.   The polluted storm water then flows untreated into the San Joaquin River.

170.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water

quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

171.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit.

172.    Every day since at least November 6, 2018, that Defendant has discharged and continues to discharge polluted storm water from its facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.


### SIXTH CAUSE OF ACTION
**Failure to Comply with Required Exceedance Response Actions**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

173.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

174.    The General Permit requires that all Dischargers who enter Level 1 or Level 2 status comply with specific Exceedance Response Actions delineated in Section XII of the General Permit.

175.    As herein alleged, Defendant Valley Recycling, Inc., has failed to date to comply with the Exceedance Response Actions required of it by the General Permit.

176.    Each day since November 6, 2018, that Defendant has failed to comply with the Exceedance Response Actions required by the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

### SEVENTH CAUSE OF ACTION
### Failure to Comply with the Mandates of the Regional Water Board
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

177.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

178.    Regional Water Boards have general authority to enforce the provisions and requirements of the General Permit, including reviewing SWPPPs, Monitoring Implementation Plans, ERA Reports, and Annual Reports and requiring Dischargers to revise and re-submit PRDs, conducting compliance inspections, and taking enforcement actions.  General Permit Section XIX

179.    On February 8, 2019, the Central Valley Regional Water Quality Control Board issued Defendant Valley Recycling, Inc. a Notice of Violation requiring that Defendant 1) Submit a report explaining why storm water samples have not been collected and analyzed for the first half of the current reporting period, while additionally describing what actions will be implemented to ensure that storm water sampling and analysis is conducted in accordance with the Industrial General Permit requirements in the future; and 2) Submit documentation of SWPPP training provided to the Pollution Prevention Team regarding storm water sampling and analysis by March 11, 2019.

180.    To date, Defendant has failed to comply.

181.    Each day since March 11, 2019, that Defendant has failed to comply with the mandates of the Regional Water Board is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

### EIGHTH CAUSE OF ACTION
### Failure to Properly Train facility Employees and Pollution Prevention Team
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

182.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

183.    Section X(D)(1) of the General Permit requires each facility to establish a Pollution Prevention Team responsible for implementing the requirements of the General Permit. The facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

184.    Section X(H)(f) of the General Permit also requires that each facility ensure that all of its Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained.

185.    Since at least November 6, 2018, Defendant has failed to properly implement and train a Pollution Prevention Team, which has resulted in the General Permit violations alleged herein.  These violations are ongoing and continuous.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.      Declare Defendant to have violated and to be in violation of the CWA;

2.      Issue an injunction ordering Defendant to immediately operate its facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.      Enjoin Defendant Valley Recycling, Inc., from discharging pollutants to the surface waters surrounding its facility until such time as Defendant has developed and implemented an adequate SWPPP and implemented appropriate BMPs;

4.      Order Defendant to pay civil penalties of $56,460.00 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.      Order Defendant Valley Recycling, Inc., to take appropriate actions to restore the quality of United States waters impaired by activities at its facility;

6.      Order Defendant to pay PEA's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law;

7.      Award Plaintiff additional attorney fees under California Code of Civil Procedure §1021.5, to the extent that Plaintiff's Notice of Intent to Sue directed to Defendant was the catalyst for Defendant's voluntary corrective action or cessation of the violations included in Plaintiff's Notice, provided that Defendant undertook any such corrective action after receiving Plaintiff's Notice, and;

8.      Award such other and further relief as may be just and proper.

Dated: August 8, 2024,                    Respectfully,

By: _____
                                          Xhavin Sinha (CA Bar #309340)
                                          SINHA LAW
                                          3901 Lick Mill Blvd. Ste. 356
                                          Santa Clara, CA 95054
                                          Tel.: 408-791-0432
                                          Attorney for Plaintiff